VILLAGE OF BRONXVILLE v. LAWRENCE PARK REALTY CO.

(Supreme Court, Special Term, Westchester County. November 3, 1913.)

1. MUNICIPAL CORPORATIONS (§ 654*)—STREETS—ENCROACHMENTS—ACTIONS—EVIDENCE.

In an action by a village to compel the removal of alleged encroachments from a street, evidence *held* to show that the street, when originally laid out as a highway, was located as claimed by the village.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1428; Dec. Dig. § 654.*]

2. DEDICATION (§ 35*)—ACCEPTANCE—ACTS CONSTITUTING.

Where, following a written dedication of a small triangle at the intersection of two highways, the town authorities prepared it for road purposes, reduced the dedicator's real estate assessment by deducting such triangle, worked it in part, and included it in its official survey of the town roads, and the triangle was used by the public, there was an implied acceptance thereof making it a part of the highway.

[Ed. Note.—For other cases, see Dedication, Cent. Dig. §§ 68–71, 75, 76; Dec. Dig. § 35.*]

3. DEDICATION (§ 35*)—ACCEPTANCE—ACTS CONSTITUTING.

Where a town worked and used the greater part of a triangle dedicated for highway purposes, it accepted the whole tract, though a small part, which was high and rocky, was not so used.

[Ed. Note.—For other cases, see Dedication, Cent. Dig. §§ 68–71, 75, 76; Dec. Dig. § 35.*]

4. ESTOPPEL (§ 62*)—STATEMENTS OF OFFICERS—EXISTENCE OF STREET.

A village was not estopped by the statement of the village attorney respecting the ownership of a portion of a street upon which a privately owned building was erected.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 151–153; Dec. Dig. § 62.*]

5. MUNICIPAL CORPORATIONS (§ 655*)—STREETS—ALTERATION OF WIDTH.

The fixing of curb lines by town officials did not narrow the legal width of the highway, where there was no intention to narrow the road, especially as against a purchaser of abutting property who knew the facts.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 655.*]

6. MUNICIPAL CORPORATIONS (§ 657*)—STREETS—ENCROACHMENTS—ACQUIESCENCE.

Village authorities deal with public streets as trustees for the public with no power to appropriate them to private purposes, and their acquiescence in encroachments thereon does not forfeit the rights of the public.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 722, 844, 1429, 1496; Dec. Dig. § 657.*]

7. MUNICIPAL CORPORATIONS (§ 657*)—STREETS—ABANDONMENT—NONUSER.

The statute, providing that highways which have ceased to be traveled or used as highways for six years shall cease to be highways for any purpose, applies only to highways, or longitudinal portions thereof, that cease to be used for their entire width, and has no application to encroachments or nuisances in the highway.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 722, 844, 1429, 1496; Dec. Dig. § 657.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
143 N.Y.S.—50

Action by the Village of Bronxville against the Lawrence Park Realty Company. Judgment for plaintiff.

Allan R. Campbell, of New York City (Charles Scribner, of New York City, of counsel), for plaintiff.

Philip S. Dean, of New York City (Joseph S. Wood, of Mt. Vernon, of counsel), for defendant.

TOMPKINS, J. [1] The plaintiff was incorporated as a village in 1898, and is situated wholly within the town of Eastchester, Westchester county. The defendant is a domestic corporation, owning real estate with buildings thereon, situated on both sides of a village street known as the Sagamore Road. This action is brought to compel the removal of structures erected by the defendant, and alleged to be encroachments upon both sides of said village street, and involves questions as to the location and width of said Sagamore Road.

In 1860, one Edward De Witt made written application for the laying out of the highway in question, and, upon his application, proceedings were regularly taken, under the statute, which resulted, in 1863, in the laying out of said highway, which was described in said proceedings as:

"Beginning at a point where the center line of said public road or highway intersects the northerly line of the road leading from the White Plains Road to the village of Bronxville, called the Penfield Road; thence along the center line of said new public road or highway, an easterly course 123 feet to a stake; thence along the said center line north 38 degrees east 456 feet; thence along the said center line north 27½ degrees east 176 feet; thence along the same line north 16 degrees east 461 feet; thence along same line north 49¾ degrees east 355 feet; thence along same line north 46¾ degrees east 247 feet; thence along the same north 50¼ degrees east 236 feet; thence along the same north 37½ degrees east 236¼ feet; thence along same north 23 degrees east 513 feet; thence along the same north 47 degrees east 613 feet; thence along the same north 32 degrees 20 minutes east 49 feet; thence along the same north 67 degrees east 136 feet; thence along the same north 23 degrees 30 minutes east 112½ feet to Tuckahoe Road; and extending equal distances on both sides of said line above described, and to the width of three rods, as the said public road or highway was laid out, by William Livingston, civil engineer, according to map thereof made bearing date at West Farms, August 4, 1863, and hereto annexed."

The proceedings for the laying out and recording of this road were regular, and the damages for the lands taken were duly assessed.

The first question to be determined is: Where was this three-rod road actually laid out? Point one-half (½), as shown by the Livingston map, is located by agreement at the center of this Sagamore Road immediately north of the defendant's present buildings, and a line drawn from that point for a distance of 123 feet to Point O, and west of the Underhill barn, brings us to the Pondfield Road at a point 68¼ feet east of the New York & Harlem Railroad property, so that the center of the highway, as thus laid out, is at a point 68¼ feet east of the monument marking the easterly line of the railroad property at the southwest corner of the Underhill property. This course and direction of the road agrees with the testimony of the witnesses respecting the location of the Underhill fence, to the effect that the

road existed and was traveled by the public close to that fence. To concede the defendant's claim with respect to the meaning of the Livingston map would be to run the road through the Underhill barn and across the triangle upon which that barn stood, and which was afterwards dedicated by Underhill to the public for highway purposes. Besides, the evidence seems to preponderate in favor of the plaintiff's claim that the road, prior to 1871, was immediately west of the said Underhill barn, and the original lead pencil notes and drawing made by Surveyor Hyatt about 1870, from the original Livingston map, and his own knowledge of the premises and experience in surveying the lands in that neighborhood, show that the road laid out as aforesaid ran west of the Underhill barn, and that at point one-half it took a turn toward the southwest. Surveyor Hyatt knew the Underhill barn as it existed in 1871, and the road as it was laid out in 1863, and as it was thereafter maintained and used, and he testified that his notes and maps correctly showed the true location of both. His surveys and notes were made from actual knowledge of the conditions as they existed after the road had been laid out by the town authorities, and while the barn stood in its original position upon the Underhill triangle.

The preponderance of evidence seems to me to support the plaintiff's claim in respect to the location of the three-rod road that was officially laid out in 1863, and that had remained open, and was used more or less by the public from that time until the defendant erected its buildings in 1902 and 1904.

To support its contention, the defendant in part relies and lays emphasis upon the survey and map made by Byrnes & Darling, in 1898, which shows the lines of the street in question to be parallel, practically all the way to the north side of the Pondfield Road, and to be of uniform width from the Pondfield Road in a northerly direction toward Tuckahoe, and does not show the fan-shaped highway at the Pondfield Road that is claimed by the plaintiff to have existed prior to the erection of the defendant's buildings. The force of this contention is lost, however, when we consider the fact that this survey was made and this map prepared for the purpose of showing the lines and profile of the Pondfield Road for contract work that was to be done thereon, for the town of Eastchester, and the Sagamore Road is only incidentally shown upon the map for the purpose of locating the northerly line of the Pondfield Road at that point. In other words, it was not a survey, and does not purport to be a map of the Sagamore Road, but of the Pondfield Road only. And besides, it appears that, only the year before (1897), another map was made for the town of Eastchester by the same firm of engineers, Byrnes & Darling, showing a portion of the plan and profile of the Sagamore Road where it intersects the Pondfield Road, and for a considerable distance north thereof. This map purports to show the boundary lines of the Sagamore Road, and also shows the center thereof, and the part of said road that was to be macadamized, for which purpose the survey and map were made. This map shows the width of the Sagamore Road at the Pondfield Road, at approximately the number of feet claimed for

it by the plaintiff, and it also shows the easterly and westerly lines of the road near the Sagamore Road to curve in the directions and at the angles of the old road, as the plaintiff claims they existed prior to the alleged encroachments by the defendant, and the map prepared by the same engineers in 1913, which purports to show the physical bounds of the Sagamore Road, and Pondfield Road, as they now are, and the physical conditions as they existed in 1897 and 1898, show that in the latter years, and before the defendant's buildings were erected, the Sagamore Road widened as it approached the Pondfield Road, and that at the Pondfield Road it was of the approximate width now claimed for it by the plaintiff.

The map made by Mapes in 1890, showing the property belonging to W. B. Lawrence afterward conveyed to the defendants, also showed that the Sagamore Road widened as it neared the Pondfield Road, and that there were substantial curves on both its westerly and easterly lines leading into the Pondfield Road.

[2] In 1871, Underhill, by a written instrument, dedicated the barn triangle already mentioned to the public use, to be forever thereafter kept open as a public road or highway, and in the instrument of dedication the triangular piece was described as being bounded by the public highway leading to Tuckahoe, the Pondfield Road, and the land of James M. Prescott, which he had previously purchased from Underhill.

This written dedication of the barn and triangle came about in this manner: In 1849, Prescott had purchased from Underhill the land on the east of Sagamore Road, excepting this triangle, and Underhill had given Prescott a right of way over a part of his lands on the west side of the Sagamore Road, and, in consideration of Prescott's surrender of that right of way, Underhill dedicated the barn triangle to the public, and to become a part of the Sagamore Road, as it then existed, so that, with the triangle taken into and made a part of the public highway, the Prescott premises became adjacent to said highway. Soon after this written dedication by Underhill of the barn triangle, to the public, for highway purposes, he removed the barn therefrom, and thereafter the town authorities blasted rock in said triangle, and prepared it for road purposes, and for years thereafter it was in part worked by the town authorities, and used by the public and the town authorities, in consideration of Underhill's dedication of the triangle for highway purposes, reduced his real estate assessment by deducting therefrom a half acre of land representing the said triangle.

In 1898 the official survey of the town roads, and the map made therefrom, and filed in the town clerk's office, showed this triangle to be a part of the public road, and the map of 1897, made by Byrnes & Darling already referred to, shows that the road includes this triangle.

These acts by the town authorities, and this use by the public, constituted, in my judgment, a legal acceptance of the Underhill triangle, so that there was an express dedication by Underhill, and an implied acceptance by the town authorities, and the public, thereby constituting the barn triangle a part of the Sagamore Road, a large part of

which was used for highway purposes down to the time that the defendant erected its hotel building partly thereon; and a large part of that triangle is now the traveled part of the Sagamore Road, while the larger part of the original road, as it was laid out in 1863, is now covered by the Arcade Building.

The triangle was about 101 feet on the Pondfield Road, which added to the three-rod road, as it was laid out in 1863, made the entire width of the Sagamore Road, at the Pondfield Road, approximately 150½ feet, practically all of which was open, worked, and used prior to the erection of the defendant's buildings.

[3] It is true that a part of the barn triangle was not used for highway purposes because it was high and rocky, but the greater part of that plot was worked and used, and that, in my opinion, was sufficient to constitute an acceptance of the whole tract dedicated by Underhill for highway purposes.

Thus we find that the Sagamore Road, at its intersection with the Pondfield Road, was originally 150½ feet in width, made so by the laying out of 49½ feet in 1863, and the express dedication of the barn triangle by Underhill, and the acceptance thereof by the town authorities in 1871, which barn triangle immediately adjoined on the east, the road as laid out in 1863. From the Pondfield Road running north, the Sagamore Road gradually narrowed until it reached the northerly end of the triangle, where it was three rods wide, and so continued to the north.

I have given careful consideration to the claims made by the defendant's counsel in their very exhaustive and able brief: First, that the plaintiff is estopped, by its acts and resolutions, and by those of its predecessor, the town of Eastchester, from claiming that the lines of the Sagamore Road, as they now exist, are not correct lines of said road; and, second, that there has been an abandonment of the road, under the six-year statute.

[4] As to the first claim, there is no proof of any proceeding by the town or village authorities to alter or narrow the Sagamore Road. Neither the town nor the village was a party to the conveyance by the Underhill heirs to William V. Lawrence in 1898, over which the Arcade Building now stands; nor had they any control over Mr. Hyatt, the engineer, who made the survey for the purpose of that conveyance; nor is the village bound by the statement to Mrs. Smith by the village attorney respecting the ownership of the land upon which the Arcade Building was erected.

[5] The fixing of the curb lines by the town officials was not effective to narrow the legal width of the highway. St. Vincent Orphan Asylum v. City of Troy, 76 N. Y. 108, 32 Am. Rep. 286; D. L. & W. R. Co. v. City of Buffalo, 158 N. Y. 266, 53 N. E. 44.

Nor do I think that there was any intention on the part of the town officials to narrow the road, either by the location of the curb lines or the placing of the macadam, and the defendant and its predecessor in title had no right to rely upon such work as fixing the bounds of the highway. Besides, Mr. Lawrence, who purchased the property from Prescott and the Underhill heirs, and who conveyed it to the

defendant, and who is interested in the defendant company, was. familiar with all the premises and the highways as .they existed from 1889. · The acts and conduct of the village authorities, in respect to this road, from the date of its incorporation, do not operate as an estoppel.

[6] Village authorities can only ·deal with public streets as trustees: for the public, and have no power to appropriate them to private purposes, and the acquiescence of village officers in encroachments upon the public street cannot forfeit the right of the public therein.

[7] I think there has been no abandonment of any part of the original highway. The statute which provides that "all highways which have ceased to be traveled or used as highways· for six years, shall cease to be highways for any purpose," applies only to streets or parts of streets that cease to be used for their entire width, and is not applicable to a case where a trespasser encroaches or creates a nuisance upon a part of a street only, leaving the rest to be used by the public, and open from end to end. In other words, it is only where longitudinal portions of a highway cease to be used at all that the six-year statute applies.

My conclusions upon the whole case are that the preponderance of evidence supports the plaintiff's claim as to the width, condition, and use of Sagamore Road before the plaintiff's buildings were erected, and that both the Arcade Building and the Gramatan Inn building encroach upon said street the number of feet alleged in the complaint, and that the plaintiff is entitled in law and equity to a judgment directing the removal of said encroachments.

The effect of such a judgment, however, if enforced, will mean the destruction of two very valuable buildings that are ornaments to the village, the destruction of which will disfigure its principal thoroughfare, i. e., Pondfield Road, and at the same time will entail very large cost and damage to the defendant, without corresponding benefit to the village, and it seems to me that the parties to this action should agree that the present street be made of sufficient width to accommodate its present and future traffic .by the removal of the Arcade Building only, or so much thereof as may be necessary to accomplish that end, without interfering with the Gramatan Inn building. This should be done in the interest of all parties concerned, even though the widened street may not be on the same lines and in the same location as the original street; and, while the trustees of the defendant may not have authority in law for a compromise of that character, yet it could be accomplished by a proceeding under the statute, to discontinue a part of the original street, that is, the part upon which the Gramatan Inn stands, and shift it toward the west.

My suggestion is that by agreement the street be restored to its original width, as nearly as can be, by the removal of the whole or a part of the Arcade Building only, without disturbing the Gramatan Inn, thereby reducing, as far as possible, the damage to be suffered by the defendant.

Requests to find may be submitted by November 15th.